NO. 23-1463

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

ROBERT HENON,
Appellant

APPEAL FROM JUDGMENT OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 19-64 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIEF FOR APPELLEE UNITED STATES OF AMERICA

JACQUELINE C. ROMERO
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

FRANK R. COSTELLO, Jr.
Assistant United States Attorney

615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8442

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................1

STATEMENT OF ISSUES ........................................................................ 2

STATEMENT OF THE CASE ................................................................... 3

    I.    Procedural History ..................................................... 3

    II.    Statement of Facts ...................................................... 5

        A.    Overview.......................................................... 5

        B.    The Quid: Salary and Other Benefits
            Worth Over \$170,000 ...................................... 8

        C.    The Quo: Official Acts at Dougherty's
            Direction .......................................................17

STATEMENT OF RELATED CASES...........................................................31

SUMMARY OF ARGUMENT ................................................................... 32

ARGUMENT.......................................................................................... 33

    I.    HENON'S NEW ARGUMENT THAT
        PROOF OF AN "EXPLICIT" AGREEMENT
        WAS REQUIRED WAS WAIVED, AND FAILS
        ANYWAY ON PLAIN ERROR REVEW ................................... 33

    II.    THE DISTRICT COURT CORRECTLY DENIED
        THE DEFENDANT'S MOTION FOR JUDGMENT
        OF ACQUITTAL, OR, IN THE ALTERNATIVE,
        A NEW TRIAL ON COUNTS 110 AND 114 ............................... 48

CONCLUSION........................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Cavazos v. Smith,*
   565 U.S. 1 (2011) ...................................................................... 48

*Coleman v. Johnson,*
   566 U.S. 650 (2012) .................................................................. 48

*Evans v. United States,*
   504 U.S. 255 (1992) ................................................................... 37

*Jackson v. Virginia,*
   443 U.S. 307 (1979)............................................................. 48, 49

*Laborers' Int'l Union of N. Am., AFL–CIO v. Foster*
   *Wheeler Energy Corp.,*
   26 F.3d 375 (3d Cir. 1994) ........................................................ 35

*McCormick v. United States,*
   500 U.S. 257 (1991)............................................................. 36, 40

*McDaniel v. Brown,*
   558 U.S. 120 (2010) .................................................................. 49

*McDonnell v. United States,*
   579 U.S. 550 (2016) ...................................................... 37, 39, 46

*Simmons v. City of Phila.,*
   947 F.2d 1042 (3d Cir. 1991)..................................................... 36

*United States v. Antico,*
   275 F.3d 245 (3d Cir 2001) ................................................. 33, 37

*United States v. Bradley,*
   173 F.3d 225 (3d Cir. 1999)....................................................... 37

*United States v. Brodie,*
    403 F.3d 123 (3d Cir. 2005)................................................ 48

*United States v. Bryant,*
    556 F. Supp 2d. 378 (D. N.J. 2008) ................................... 6, 41-43, 47

*United States v. Bryant,*
    655 F.3d 232 (3d Cir. 2011)..........................................passim

*United States v. Caraballo-Rodriguez,*
    726 F.3d 418 (3d Cir. 2013) ........................................ 48, 49

*United States v. Gordon,*
    290 F.3d 539 (3d Cir. 2002) ............................................ 33

*United States v. Jabateh,*
    974 F.3d 281 (3d Cir. 2020)........................................ 44, 45

*United States v. Kemp,*
    500 F.3d 257 (3d Cir. 2007) ..........................................7, 37

*United States v. Repak,*
    852 F.3d 230 (3d Cir. 2017) ............................................ 47

*United States v. Silver,*
    948 F.3d 538 (2d Cir. 2020) ............................................ 46

*United States v. Vampire Nation,*
    451 F.3d 189 (3d Cir. 2006).......................................2, 32, 57

*United States v. Wright,*
    665 F.3d 560 (3d Cir. 2012)............................................ 38

## Statutes and Rules

18 U.S.C. § 371 ................................................................ 3

18 U.S.C. § 1341 .............................................................. 3

18 U.S.C. § 1343 ........................................................................ 3

18 U.S.C. § 1346 ........................................................................ 3

18 U.S.C. § 1546(a) ................................................................... 44

18 U.S.C. § 3231 ......................................................................... 1

28 U.S.C. § 1291 .......................................................................... 1

Fed. R. Crim P. 52(b) ............................................................... 44

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over this matter under 28 U.S.C. § 1291.

## **STATEMENT OF ISSUES**

1. Did the defendant waive his new argument that the government was required to prove an explicit quid pro quo regarding bribery counts not resting on campaign contributions, and if not, did the district court commit plain error?

2. Did the government present sufficient evidence to prove the honest services fraud charges in Counts 110 and 114 resting on campaign contributions?

3. Did this Court correctly decide *United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006), with respect to imposition of an in personam money judgment as forfeiture?

## STATEMENT OF THE CASE

### I. Procedural History

Appellant Robert Henon, then a member of the Philadelphia City Council, was charged along with defendant John Dougherty, then the business manager of a prominent Philadelphia union, Local 98 of the International Brotherhood of Electrical Workers, with public corruption offenses. The 116-count indictment, returned on January 29, 2019, also named six other defendants, who were charged along with Dougherty in various fraud offenses.

Henon and Dougherty were charged alone in Counts 97 to 109, while Henon was also charged in Counts 110 to 116. The district court severed those counts for a separate trial that is the subject of this appeal.

The indictment charged that "[f]rom at least in or about May 2015, to in or about September 2016," Dougherty and Henon conspired to commit honest services fraud and federal program bribery, in violation of 18 U.S.C. § 371 (Count 97), and committed honest services wire and mail fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1346 (Counts 98-109). The indictment alleged that Dougherty paid Henon bribes in the form of a "stream of personal benefits," which included Henon's salary and benefits

from Local 98 and tickets to sporting events, with the intent to influence Henon, and in exchange for Henon's performance of official acts.

Counts 110-112 (honest services wire fraud) and 114-116 (federal program bribery) pertained to Henon's solicitation and acceptance of campaign contributions from the Communications Workers of America Local 13000 ("CWA") in exchange for official acts. Count 113 charged Henon with federal program bribery arising out of his acceptance of things of value concerning legislation involving the Philadelphia Parking Authority (PPA).

The trial began on October 4, 2021. At the conclusion of the government's case, the district court mostly denied motions for acquittal by the defendants, but dismissed Count 107 as to Dougherty and struck the related overt act from the conspiracy count.[1] App. 33.

On November 15, 2021, the jury convicted both defendants of Count 97 (conspiracy), and Counts 100, 101, 102, 103, 105, 106, and 108 (honest services wire fraud). In addition, Henon was convicted on Counts 110 and 114, charging him with honest services wire fraud and federal program

---

[1] As a result of this ruling, the sole object of the conspiracy charge was honest services fraud.

bribery, arising from his solicitation and acceptance of a $5,000 campaign contribution from the CWA.

The district court denied the defendants' post-trial motions and issued a memorandum opinion explaining its rulings. App. 11, 13-27.

On March 3, 2022, Henon was sentenced to 42 months' imprisonment, to be followed by a three-year term of supervised release. App. 3-10. The court also imposed a fine of $50,000 and ordered Henon to forfeit $207,948.70 of proceeds of the offenses of conviction. App. 10.

## II. Statement of Facts

### A.    Overview.

During the period charged in the indictment, May 2015 through September 2016, defendant Robert Henon was a member of Philadelphia City Council, representing the Sixth Council District in Philadelphia. He was also a part-time employee of Local 98. App. 489-542, 557-650.

During the same period, defendant John Dougherty was the Business Manager of Local 98. As Business Manager, Dougherty controlled the operations of Local 98. All of the union's employees were subordinate to him. App 3047-49.

Through Dougherty, Local 98 paid Henon approximately $70,000 in 2015 and $73,000 in 2016. App. 1769-80; Supp. App. 125-44, 185. During

this same period, Dougherty gave him tickets to sporting events worth more than $20,000. App. 2959-93, 2997-3008; Supp. App. 182. Henon accepted his Local 98 salary and tickets from Dougherty in exchange for Henon's performance of official acts at the direction of and on behalf of defendant Dougherty. Henon did not perform any significant work of any kind for Local 98 apart from his efforts as a member of the Philadelphia City Council to act as directed by and to benefit Dougherty.

Separately, Henon accepted a $5,000 bribe from a CWA union, in the form of a campaign contribution, to advocate on its behalf. In this appeal, Henon challenges the sufficiency of the evidence regarding the two counts of conviction related to that bribe. The pertinent facts and evidence regarding the CWA matter are therefore set forth in the argument portion of this brief, at part II.

With respect to the unlawful arrangement between Dougherty and Henon, that was the focus of most of the evidence at the lengthy trial, the government asserted that the defendants committed honest services fraud by bribery, that is, provision (or receipt) of a benefit with the intent to influence (or be influenced in) the performance of an official act (often referred to as a "quid pro quo"). *See, e.g.*, *United States v. Bryant*, 655 F.3d

232, 245 (3d Cir. 2011); *United States v. Kemp*, 500 F.3d 257, 281 (3d Cir. 2007).

After the jury convicted on counts related to this scheme (Counts 97, 100, 101, 102, 103, 105, 106, and 108 (referred to in this brief as the "Dougherty-related counts")), Henon sought a judgment of acquittal, arguing that the evidence was insufficient to prove a quid pro quo relationship. The district court denied the motion. App. 11, 13-27.

On appeal, Henon does not renew the arguments he presented to the district court regarding the Dougherty-related counts. Instead, as will be discussed in detail in part I of the argument section of this brief, he presents an entirely new argument, that the government should have been held to a more rigorous requirement of proving an "explicit" quid pro quo agreement. As will be explained later, that legal argument was waived at trial, and fails in any event on plain error review.[2]

Because the appeal regarding the Dougherty-related counts fails as a matter of law, and Henon does not present a sufficiency challenge with

---

[2] At trial, the parties agreed, consistent with this Court's precedent, with instructions to the jury that only an implicit agreement is ordinarily required to prove bribery. The parties further agreed that the heightened requirement of an explicit agreement was required with respect to the separate CWA counts, that rested on campaign contributions purported to be bribes. The jury was instructed accordingly, as will be discussed.

regard to the correct legal requirement (i.e., proof of at least an implicit quid pro quo agreement), we present here only a summary of the exhaustive evidence presented at trial. A more detailed account by the government may be found in its 63-page response to the defendants' post-trial motions for acquittal, at DDE # 271 (Jan. 4, 2022).

## B.    The Quid: Salary and Other Benefits Worth Over $170,000.

Prior to being elected to City Council in November 2011, Henon was employed as the Political Director of Local 98. Upon Henon's election, Dougherty decided to keep Henon on the payroll, at half the salary he had earner earlier, as if Henon was continuing to work for Local 98 for 20 hours per week. App. 3049-56, 4322. Henon was paid weekly, and Dougherty could terminate his employment at any time. App 1769-83, 3048-49.[3]

---

[3] There was substantial evidence that Dougherty personally made the decision to keep Henon on the payroll, starting with the evidence that permeated the trial that Dougherty was the undisputed leader of Local 98 who made all key decisions. *See, e.g*., App. 3046-49 (stipulation that Dougherty led the union and had the authority to hire and discharge employees at any time, and to set the terms of their employment). Indeed, it was Dougherty who told the Local 98 board on December 13, 2011, that "Bobby will still play a role in our union operation and will collect a check from Local 98." App. 4321-22. On November 13, 2015, Dougherty told then-Councilman James Kenney regarding Henon: "he's on my payroll." App. 4241-42. And on March 26, 2016, during the same time period as the official acts charged in the indictment, Dougherty told Henon, "I got, I made a little adjustment in your, your stuff this month. So you got a little bit more money coming." App. 4263-65.

During the period of the official acts charged in the indictment, 2015 and 2016, Henon received weekly salary payments totaling $70,649 in 2015 and $73,131 in 2016. During that same time period, he received at least $20,000 worth of tickets to sporting events, including two Eagles football games, a Phillies game, a lacrosse game, to which Henon took his family, and NCAA basketball tournament games. App. 2959-93, 2997-3008; Supp. App. 182.

The government asserted that Henon did little if anything in exchange for his Local 98 salary and benefits other than act at Dougherty's direction in performing as a member of City Council, citing the following evidence.

Federal agents conducted a search of Local 98's offices on August 5, 2016. They found no written work product of any kind by or regarding Henon. Indeed, he did not have an office or workspace at Local 98 at that time. The government served subpoenas on Local 98, during the investigation and before trial, requesting any work product pertaining to any services Henon provided to Local 98 in 2015 and 2016. Nothing was produced in response. App. 2916-26.

Further, during a wiretap spanning more than a year, agents listened to numerous calls between Dougherty and Henon. Most concerned Henon's

work on City Council.[4] The defense did not identify any that related to union work performed by Henon. App. 3019-39. Moreover, the tenor of the many conversations between Dougherty and Henon presented to the jury was unmistakable. As discussed in the next part of this statement of facts, Dougherty repeatedly gave explicit directions to Henon regarding Council actions, and described to others his ability to do so.

Four of the members of Henon's City Council staff who testified at trial, whose combined tenures spanned the period from January 2012, when Henon was first sworn in as a member of City Council, to September 2016, the end of the period charged in the indictment, all stated that they were unaware Henon was being paid by, or was allegedly working for, Local 98 until May of 2016, when an article in *Philadelphia Magazine* describing the outside incomes of all members of City Council was published.[5] App. 927-56, 1136, 1160-62, 1844-49, 2100-03. No one from Henon's staff

---

[4] As part of its investigation, the government conducted a Court-authorized Title III wiretap on Dougherty's cellular telephone from April 30, 2015, to August 26, 2016, and on Henon's cellular telephones from August 12, 2015, to August 26, 2016.

[5] Aide Tom Holroyd testified that he found out about Henon's Local 98 income when he assisted Henon in completing his public financial disclosure form for the year 2015, which Henon signed and filed in May 2016, the same month that the *Philadelphia Magazine* article was published.

replied to the author with a response to the question of what Henon actually did for his union salary, after the request had been communicated to Henon and his aide, Courtney Voss, by a staff member. App. 1844-49, 4467.

Henon's biography on the City Council website, which was written in January 2016 by his aide Jolene Byzon, with input from Henon and Courtney Voss, made no mention of his employment at Local 98. Supp. App. 116-17.

There was additional evidence that Henon and others went to lengths to conceal his "employment."

On Local 98's annual LM-2 reports filed with the United States Department of Labor for 2015 and 2016, which were signed by Local 98 President Brian Burrows, and Financial Secretary Francis Walsh, Henon's position was identified as "office." His salary was categorized by the union as being paid for the following types of work: 1) general overhead - 50 percent; 2) administration - 50 percent. These categories apply to employees who work in and around the union offices and perform administrative and maintenance work, including secretarial and security work. Even though there was a category for political work, which is how Henon's chief of staff (and paramour) generally described his work for

Local 98 (as will be discussed), the portion of Henon's salary that he was paid to do that type of work was listed as zero. App. 572, 1682-88, 1703-16, 4357-58; Supp. App. 145, 186-314.

Further, on the annual public financial disclosure forms that Henon was required to file with the City Board of Ethics and the Commonwealth of Pennsylvania in 2015 and 2016, specifying the source, but not the amount, of income over $500, Henon described his position with Local 98 as "electrician." App. 578-87, 4359-60. (No witness testified to Henon doing any work during this period as an electrician.)

There was also evidence that Henon acted to conceal the valuable sports tickets he received. For instance, Dougherty gave Henon all of the tickets in a luxury box for a Philadelphia Eagles game played on December 13, 2015. Dougherty gave Henon these tickets on November 27, 2015; at the time Henon picked up the tickets, Dougherty told Local 98 employee Marita Crawford that Henon was then "in the middle of the Comcast deal" (Henon's advocacy on Local 98's behalf in that matter is discussed later). During a conversation on December 3, 2015 (the day of a committee hearing on the Comcast Franchise Agreement, explained later), Dougherty told Henon, "good job today," and talked to Henon about the tickets to the upcoming Eagles game. App. 4243-46. Then, exhibiting his

consciousness of guilt, Henon later advised Councilwoman Helen Gym, who used one of the tickets, that he was not disclosing his receipt of the tickets, telling her, "[T]here is no trail of anything." Supp. App. 91.[6]

In response to the government's evidence regarding the absence of any specific proof of any union work performed by Henon in exchange for his salary and other benefits, Henon presented several defense witnesses whose testimony, the government contended, was completely vague. None offered any specific account of union work performed by Henon on any particular occasion.[7]

---

[6] Henon also instructed staff to use the email address @bobbyhenon.com, because he believed that the federal government could not obtain emails from his private server. App. 1159-62; Supp. App. 321.

Dougherty as well made numerous false statements about the nature of his relationship with Henon. See, e.g., Supp. App. 316 (on November 13, 2015, Dougherty to Mayor-elect Kenney: "I call Bobby Henon three times a year"); Supp. App. 8-9 (on November 30, 2015, Dougherty to Local 98 employee Chris Rupe: "personally I've never called Bobby . . . it's the only time I have ever called him for anything that I wanted"); Supp. App. 320 (on December 3, 2015, Dougherty to City Council member William Greenlee: "I was dealing with Bobby. . . [a]nd I only deal with him sporadically").

[7] In the one-sided statement of facts in the brief, Henon notes only the vague testimony that Henon may have done any work for Local 98 apart from heeding its directions in his actions on City Council, Br. 11-12, without discussing any of the contrary evidence. He also attempts to discount the significance of the evidence of Dougherty's statements to others that he controlled Henon, but only by stating that it did not show an explicit quid pro quo agreement. Br. 54.

Local 98 Assistant Business Manager James Foy testified that Henon attended monthly meetings of the Building Trades but was unable to say whether he was there as a member of City Council or as a member of Local 98 and was unable to say how many meetings Henon attended in 2015 and 2016. App. 3238-40. Similarly, Foy testified that Henon was a delegate for the AFL-CIO on behalf of Local 98 while on City Council and had seen him speak on behalf of the union on a few occasions but was unable to say how many AFL-CIO meetings Henon attended in 2015 and 2016. App. 3240-42. He also said that Henon had done some fundraising on behalf of the union and participated in labor walks. App. 3241-43. Foy also testified that Henon helped him when he was attempting to organize the Fox Chase Medical Center's maintenance workers; however, the only thing that Henon did was identify the parties with whom Foy needed to engage. App. 3242.

Pat Eiding, the president of the Philadelphia Council AFL-CIO, testified as a defense witness that Henon was a delegate, and was "involved in just about every event we do, whether it's a rally down at the airport for worker safety and benefits . . . I see him all the time." App. 3455. Eiding, however, failed to describe the nature of Henon's "involvement" or quantify what he meant by "all the time," or distinguish actions that Henon would obviously take anyway as an elected official.

Brian Eddis, who was hired at Local 98 by Dougherty in 2014, and was currently employed at the Building Trades, of which Dougherty was the Business Manager, testified that he observed Henon doing work for Local 98 "all the time," which he described as "constantly strategiz[ing]." App. 3423-24. Eddis also testified that in 2015, when there were multiple candidates for Philadelphia City Council whom Local 98 was supporting (including Henon), as well as Kevin Dougherty, the brother of John Dougherty, who was running for the Pennsylvania Supreme Court, Henon was "active with respect to those efforts." App 3424-25.

James Dollard, who was the safety coordinator for Local 98 from 2001 to 2018, testified that after Henon was elected to City Council, "Bobby was always there [at the offices of Local 98]." Dollard also testified that Henon attended Local 98 events at Thanksgiving, "the Alex lemonade stand, toys for tots [at Christmas]," and that "he was doing a lot of other things." Dollard added, however, that "I really didn't know what he was doing, but I would just see him in the hallway. . ." App. 3280-81.

Courtney Voss was Henon's chief of staff beginning in 2013 or 2014, and also was Henon's romantic paramour. She testified that in addition to working "an 80-hour work week for city council," Henon worked "a ton of hours" for Local 98, which she described as attending conferences, Building

Trades meetings, AFL-CIO meetings, and "taking calls from labor all the time and working through political issues."[8] She described his job with Local 98 as "really about politics and about managing relationships," which just happens to be closely related to his position on City Council. App. 3646-47.

Responding to a post-trial motion for acquittal by Henon, the government asserted: "In sum, this was a classic issue for resolution by a jury. There was abundant evidence that Henon did virtually nothing for Local 98 other than serve its needs as a member of City Council, including the content and tenor of the numerous intercepted calls, the absence of any physical evidence of any work, and the false statements to government bodies. The counter-presentation was a vague set of statements by Local 98 employees and others that Henon worked 'all the time' for unspecified lengths of time. There was clearly a very strong basis for the jury to agree with the government's position on this point." DDE # 271 at p. 35. The district court, after summarizing much of the same evidence, agreed. App. 16, 24-25.

---

[8] Tom Holroyd also described City Council as "more than a full-time job." App. 2103.

### C.    The Quo: Official Acts at Dougherty's Direction.

The government presented extensive evidence that, in exchange for the benefits he received from Local 98, Henon during 2015 and 2016 repeatedly took official acts in his City Council position at Dougherty's direction. The substantive Dougherty-related fraud counts of convictions rested on weekly transfers of salary payments to Henon at precisely the same time as each official act at issue. DDE # 271 at 18-20.

Again, because Henon no longer disputes that these matters, involving the Department of Licenses and Inspection, plumbing legislation, a City agreement with Comcast, debates over a soda tax, and towing legislation, concerned "official acts" as defined in federal law, and he presents no argument that a reasonable jury could not find at least an implicit quid pro quo agreement to perform these acts in exchange for payments and benefits from Local 98, we present here only an overview of these matters, which are discussed in more detail in the government's response to post-trial motions, DDE # 271.

In general, the evidence made clear that Henon consistently acted at Dougherty's direction. Henon never engaged in a discussion with Dougherty in the recorded conversations about the merits of the official actions Dougherty demanded; Henon just agreed to perform.

For instance, during a conversation about the plumbing code, Henon told Dougherty "what [he] was going to do" with the plumbing legislation, which he said he was "running it by you." After Dougherty told him to "[d]o it," Henon stated, "I'm going to do that." App. 4277-81. Similarly, the night before the Council session at which the Comcast agreement was approved, Henon called Dougherty and asked him how he should vote on a different bill (authorizing the construction of a casino in South Philadelphia), asking, "I want to vote for it tomorrow right? I mean we want to move it?", to which Dougherty replied, "Yeah, yeah." App. 4247-50.

Indeed, complaining about Henon's failure to keep him sufficiently informed about the Comcast franchise agreement negotiations, Dougherty told Marita Crawford (who occupied the position of Local 98 Political Director held by Henon before his election) the following about Henon: "He can play cute, he can't f***ing play cute with us. . . . So he calls me, . . . I don't know what to do? I said I know what the f*** to do. Well you're the only one I call, I said, right. And I'm telling you what to do . . ." Supp. App. 35.

Thus, on another occasion, Marita Crawford spoke to Local 98 employee Tommie St. Hill about rumors that Henon was running for Majority Leader in City Council. Crawford stated, "If John wants to do it.

Maybe John says, don't run for Majority, I don't know but . . . John is the boss, that's it. . . . Not Bobby, nobody." Supp. App. 40.

This dynamic was evident throughout the matters that gave rise to the following official acts that the jury found were part of the quid pro quo agreement.

1. Philadelphia Department of Licenses and Inspection (Count 100) – Henon, acting in response to calls and texts from Dougherty or his surrogates, steered officials of the Philadelphia Department of Licenses and Inspection (L&I) towards construction sites where non-union electricians or other trade unions were installing equipment or electrical systems that Dougherty wanted Local 98 member electricians to be installing. *See* App. 22, 34 (district court findings of sufficient evidence to prove these official acts).

Dougherty made clear to L&I that he would use Henon to promote his aims. In 2014, Dougherty had Henon invite L&I Commissioner Carlton Williams to a meeting in Henon's City Council office to discuss a construction site at which non-union workers were employed. Dougherty, who did all of the talking, made clear to Williams that he could have Williams fired and claimed that there were numerous safety violations at

the work site. Williams, accompanied by his staff, personally inspected the site and found no violations. App. 1094-1100.

On July 19, 2015, when Dougherty learned that a non-union company was installing an MRI machine at CHOP, he directed Henon to contact L&I. App. 4229. Henon called Commissioner Williams, which prompted L&I to send an inspector to CHOP. App. 1919-20. L&I inspector Peter DiLisi arrived at CHOP and inspected the site of the MRI installation. App. 1061-63. DiLisi's supervisor subsequently ordered him to issue violations for failure to secure an electrical permit, use of an unlicensed contractor, and failure to have a commercial activity license. The violations resulted in L&I issuing a stop work order. App. 1065-66.

When Dougherty subsequently learned that the installers had resumed work at CHOP, contrary to the stop work order, he called Henon, who claimed responsibility for L&I's action. App. 4232.

In August 2015, Henon learned that Dougherty wanted him to contact L&I about the installation of another sophisticated medical system, this one an MRI/PET machine, that was being installed at CHOP. A Local 98 business agent told Henon: "Doc [Dougherty] just asked me to give you a call again about . . . [t]he same thing as before. When we had that . . . thing down there? . . . L&I. . . . Now, now we have GE down there doing the same

thing, you know." Henon replied, "Send me the exact location again . . . And, and, and, who it is. This way . . . I can just read what it is, only because I have my hands full. . . . write it down, too. And text it to me. Don't email . . . And then, and then, and then delete your email." App. 4275-76.

When Henon later learned from the Local 98 official that the machine's manufacturer was installing the MRI/PET machine, Henon said, "I'm gonna make the call [to L&I]." Supp. App. 44. Henon promptly contacted L&I Commissioner Williams about the installation. App. 1091-92. Williams directed employees to again inspect the CHOP facility. App. 1092. On August 20, 2015, L&I issued a stop work order to the contractor. App. 1092-93.

L&I Inspector Robert Donsky inspected the job site, talked to all parties involved in the MRI installation, and determined that the employees of the manufacturer were the best qualified people for the job. App. 978-89. Despite his observations and conclusions, Donsky's supervisor ordered him to issue a stop-work order. App. 989-91.[9]

---

[9] On other occasions, at Dougherty's direction, Henon contacted L&I Commissioner Williams to complain about work at Lincoln Financial Field, the Goldtex apartments, and a Westin hotel. App. 1089-90, 1094-1106, 4233-4236. On those occasions, L&I investigated and found no improprieties at the sites.

2. Plumbing Code legislation (Count 101) – the Philadelphia
Plumbing Code (PPC) is a set of rules and regulations governing plumbing
installations in the City of Philadelphia. Around 2015, there was a push to
abolish the PPC and replace it through city legislation with the
International Plumbing Code (IPC). The local plumber's unions opposed
this, because they believed that the IPC was not suitable to plumbing
installations in Philadelphia. Plumbers, including members of the
Plumber's Union working in Philadelphia, were in favor of modernizing the
existing PPC instead of adopting the IPC. App. 1652-54.

On August 20, 2015, Henon asked Dougherty what he should do
concerning the pending Plumbing Code legislation which, he said, "the
plumbers don't want." He told Dougherty that he was considering
introducing and then holding the legislation until the new mayoral
administration took office in January 2016, so the plumbers had to go
through him. Dougherty immediately told Henon to "do it," to help
Dougherty be elected Business Manager of the Building Trades, which was
an organization made up of unions representing various trades, such as
electricians, plumbers, glazers, and sheet metal workers. Dougherty stated
that he believed the head of the Plumbers Union was going to vote against

Dougherty for Business Manager of the Building Trades. Henon agreed and reminded Dougherty that "this is an us thing." App. 4277-81.

On September 2, 2015, the day of the Building Trades election, Henon told an elected state official that he was using the legislation concerning the plumbing and electrical codes as leverage for "internal trade politics" and that he intended to "disguise it in the middle of everything" because the Plumbers Union was "against John [Dougherty], you know, with the Building Trades." That same day, Henon attended the meeting of the Building Trades at which Dougherty was elected Business Manager. Supp. App. 47.

The district court agreed that Henon's manipulation of legislation before City Council to benefit Dougherty's prospects was an official act the jury could find was part of the quid pro quo agreement. App. 11, 13-27, 34, 188-90.

3. Comcast franchise agreement (Counts 105 and 106) – in 2015, Henon was the Chair of the Public Property Committee, which was overseeing the negotiations of the Comcast cable franchise agreement on behalf of the City of Philadelphia. In November 2015, nearing the completion of the negotiations, Henon and Comcast officials discussed and identified the remaining items on which they had not yet reached

agreement. By mid-November, it appeared that the parties had reached an agreement. Supp. App. 93-104.

The night of November 30, 2015, after hearing that the City and Comcast had reached a consensus on the franchise agreement, Dougherty made angry calls to a number of people, including Local 98 Political Director Marita Crawford and Henon (twice), to complain that Henon was not keeping him sufficiently informed about the negotiations and had not addressed his demands. App. 4268-71, 4297-4302, 4303-10; Supp. App. 8-22.

By the conclusion of the second call between Henon and Dougherty, which occurred late on November 30, Henon agreed to do what Dougherty wanted. App. 4303-10. Almost immediately after the second call with Dougherty, Henon sent emails to his staff, including Courtney Voss, at around midnight stating that they needed to address the issues Dougherty wanted. Voss' response was that she was confused and suggested that "you now know something that you're not sharing." Supp. App. 122.

During a December 2, 2015, negotiating session in Henon's office, Dougherty told Comcast employees Kathleen Sullivan and Mark Reilly that the franchise agreement would not go forward in Henon's committee unless Dougherty's demands were met. App. 2128, 2134-40, 2366-68, 2663-64.

Mark Reilly, in an email message sent not long after the session had concluded, described it as follows:

> We reached a deal on terms. It's all about the unions and Johnnie Doc. I met with Doc for over an hour today. The . . . demand made is that we agree to have all commercial construction in the public right of way go to the unions. I said if they are going be competitive. They said they'd be competitive (lie). I have sent Doc our rate card for construction work. He is going to get back to me. If we don't agree, he controls the votes to deny. Awesome day!

App. 4352.

Henon delayed the December 3, 2015, hearing of the Committee on Public Property so that Comcast could address Dougherty's demands, once again telling Dougherty, "I'm not gonna do it without. . . without, without us, right, you." Supp. App. 56-66; App. 2669-73. On December 3, 2015, after a final agreement was reached, Henon voted to move the agreement out of the Public Property committee. App. 2548. A week later, he voted to approve the agreement. App. 2560-61.

As the district court stated, when finding sufficient the allegations in the indictment to aver bribery,

> [T]he Government's allegations relative to the Comcast franchise agreement extend well beyond a public official setting up a typical meeting. Indeed, the relevant allegations against Henon include the following:

> 1) Causing his Chief of Staff to advise a Comcast negotiator that if Comcast hired MJK Electric, it would advance the negotiations;

2) Agreeing to delay the vote to move the franchise agreement out of his committee until it contained the provisions that Dougherty wanted;

3) Allowing Dougherty to participate in the negotiations and demand concessions from Comcast as a condition for the approval of the agreement;

4) Voting to move the agreement out of his committee and present the franchise agreement to City Council;

5) Voting in favor of the franchise agreement; and

6) Drafting an agreement with Comcast memorializing the concessions Henon allowed Dougherty to demand using his City Council office.

App. 182 (opinion denying motion to dismiss indictment). *See also* App. 35 (opinion denying Rule 29 motions).

4. Towing resolution (Counts 102 and 103) – on the evening of September 22, 2015, Dougherty nearly had his car towed by George Smith Towing because he had doubled-parked, and while his car was hooked up to the tow truck, became irate over the experience. He immediately made five angry phone calls to Richard Lazer, who had previously worked for Mayor-elect Kenney, and was subsequently appointed Deputy Mayor for Labor. Supp. App. 1-7.

During the last call, Dougherty told Lazer that he was going to go to Henon and "[t]here will be a bill in Council next week" to "f***" the George Smith Towing Company (and another company that Lazer mentioned).

Dougherty also told Lazer, in the same call, that "Bobby Henon will put a bill in tomorrow." Supp. App. 6-7.

Thereafter, Dougherty called Henon, which was his first contact with Henon that night. App. 2088-90. During that call, Dougherty told Henon about the towing incident, and said, "I think tomorrow we f***ing put in a bill to certify," and that "I think what we do is, we . . . we'll f***ing put a bill through council." Dougherty also told Henon, "Just tell them . . . you got, because you have heard nothing but complaints." App. 4237-40. Dougherty also told Henon in that call to "[h]old hearings again on them," to which Henon quickly agreed: "Yep. Yeah, I'll get something, I'll get something together." App. 4239.

A week later, on September 29, 2015, Courtney Voss, Henon's chief of staff, sent two emails to Tom Holroyd, who was working on Henon's City Council staff. The first directed Holroyd to go to George Smith Towing and take a photo of any sign that said "cash only" within the next 48 hours. (That period encompassing the next date when City Council would be in session.) App. 2104; Supp. App. 112. The second email directed Holroyd to "[d]raft resolution calling for hearings into practices and procedures used by George Smith Towing. Make sure you include language in it that enables us to subpoena witnesses." App. 2104-05; Supp. App. 113.

Holroyd followed the instructions from Voss, taking a single visit to George Smith Towing and drafting a resolution. App. 2108-09. On September 30, 2015, Holroyd sent to Voss a draft resolution which authorized City Council to hold hearings "to investigate the operations of George Smith Towing Inc," and to subpoena witnesses. App. 2109-10; Supp. App. 114-15. That same day, Voss forwarded Holroyd's email with the draft resolution to Henon, asking him if he would like to introduce it the following day. Supp. App. 111. The resolution, however, did not proceed further.

5. Soda tax (Count 108) –even though Henon was undecided about the mayor's proposed soda tax (a tax on sugar-sweetened beverages), Dougherty assured Mayor Kenney as early as February 2016 that Henon would support it, and let Henon know that he had done so. Dougherty also subsequently ordered Henon to stay on course concerning the soda tax.

On February 11, 2016, Dougherty told Mayor Kenney that Henon "really wanted to do" the soda tax, even though Henon had had made no such statement at the time. App. 4252-56. Later that day, Dougherty told Henon that he had told Mayor Kenney that Henon was interested in the soda tax and that Dougherty wanted Henon to be involved in the negotiations concerning the tax. Supp. App. 23.

In two subsequent conversations with Marita Crawford, the Political Director of Local 98, the second of which was on April 6, 2016, however, Henon was still undecided. Supp. App. 67-71. But during a conversation a few weeks later, Dougherty told Henon to start setting up meetings with other Council members to enlist their support for the tax.

Henon's staff was aware that the negative impact of the soda tax on the residents of Henon's district outweighed the potential gains, that many of his constituents were against the tax, and that Henon "agonized" over whether to support the tax. App. 1880-81, 1183-87, 1191-94; Supp. App. 119-21.

But Dougherty supported the soda tax from the outset because it would be the first big achievement for Mayor Kenney, whom Dougherty had publicly supported. App. 4260-61; Supp. App. 28 ("I am trying to make him successful, because we are getting way more out of him [Kenney] than we ever got"). On March 1, 2016, Dougherty sent Henon a text message, telling him to "stay INFRONT of the soda tax!!!" Supp. App. 30.

Once it appeared that Henon was going to support the soda tax, Dougherty continued to direct him. On or about May 7, 2016, Dougherty instructed Henon to start talking to other City Council members about the soda tax. Supp. App. 77. On May 16, 2016, Dougherty told Henon that

Henon needed to talk to Mayor Kenney soon about getting a compromise on the soda tax. Supp. App. 32. On May 24, 2016, Dougherty called Henon and told him to stay in the middle of the discussion about the tax and gave him additional instructions. Supp. App. 85. Henon voted for the tax on June 16, 2016. App 1191-93.

## STATEMENT OF RELATED CASES

Codefendants Marita Crawford, Brian Fiocca, Anthony Massa, Michael Neill, and Niko Rodriguez pleaded guilty and are awaiting sentencing. Codefendants John Dougherty and Brian Burrows are awaiting a trial verdict on Counts 1-96.

## SUMMARY OF ARGUMENT

1. With respect to the Dougherty-related honest services fraud counts, appellant Henon exclusively argues that the government should have been required to prove an "explicit" quid pro quo agreement, and that the trial evidence failed to meet that requirement. That argument is rejected by an abundance of Third Circuit precedent. Henon in fact expressly waived the argument at trial, and given that there is no authority to support it, it fails on plain error review anyway.

2. The government presented sufficient evidence to prove that the CWA local and Henon entered an express quid pro quo arrangement in which the union made a $5,000 campaign contribution in exchange for official action.

3. Henon's challenge to the *Vampire Nation* decision with regard to forfeiture is presented only to preserve it for further review.

# ARGUMENT

## I. HENON'S NEW ARGUMENT THAT PROOF OF AN "EXPLICIT" AGREEMENT WAS REQUIRED WAS WAIVED, AND FAILS ANYWAY ON PLAIN ERROR REVEW

### Standard of Review

A challenge to the sufficiency of the evidence that was not presented at trial is reviewed for plain error, if not waived. *See United States v. Gordon*, 290 F.3d 539, 547 (3d Cir. 2002). Similarly, when an appellant did not object to jury instructions, this Court's review of those instructions is for plain error. *United States v. Antico*, 275 F.3d 245, 265 (3d Cir 2001).

### Discussion

The entire premise of appellant Robert Henon's appeal with regard to the honest services counts of conviction involving John Dougherty (Counts 97, 100, 101, 102, 103, 105, 106, and 108) is that the government failed to prove an "explicit" quid pro quo bribery agreement. He asserts that the law prohibiting bribery, that is ordinarily satisfied by proof of an implicit agreement, should require heightened proof of an explicit agreement where the bribe payment is made to a public official in the guise of salary for outside employment. As the district court did not require such proof at trial, Henon argues that his convictions should therefore be vacated on the

grounds of insufficient evidence, or in the alternative, he should receive a new trial at which the jury is instructed regarding this requirement. Br. 50-56.

However, not only did Henon not advance this legal argument regarding the elements of bribery in the district court before or after trial, but he expressly waived this claim. The arguments therefore should not be considered, and if they are considered, they must fail on plain error review.

Notably, Henon makes no effort to rebut the district court's conclusion that the government presented sufficient evidence to allow a reasonable jury to conclude that Dougherty and Henon implicitly agreed that Henon would perform official acts at Dougherty's direction in exchange for Henon's receipt of salary for a no- or minimal-work job. He musters only a single sentence otherwise in his summary of argument, Br. 34, then describes the question in the brief as a "threshold matter," without any further explication. Br. 49.[10] In the argument portion of the brief, he

---

[10] Henon contends:

As a threshold matter, the District Court erred in not entering judgment of acquittal on the Local 98-related counts because the government failed to present sufficient evidence to prove beyond a reasonable doubt that Mr. Henon *implicitly agreed* that he would take particular official acts *at least in part* because of his Local 98 compensation. But even if the evidence *were* sufficient to permit the
*continued . . .*

instead promptly moves to his position on appeal: "That the interests and positions of his longstanding employer and the actions he took as an elected official have some (even substantial) overlap should not form the foundation for a federal conviction without significantly more evidence of their explicit connection than was presented here. In fact, no evidence was presented that Mr. Henon explicitly agreed that his decision whether to take particular official acts would be controlled by the benefits he received for his permissible outside employment." Br. 50-51.

The one-sentence challenge to proof of an implicit agreement stands as a waiver. "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" *Laborers' Int'l Union of N. Am., AFL–CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)

---

jury to infer that an implicit agreement existed, the District Court still erred in not entering judgment of acquittal on these counts because the government did not prove that Mr. Henon *explicitly agreed* to take particular official acts *specifically because* he was receiving benefits from Local 98.

Br. 49 (emphasis in original). Henon says nothing further about this "threshold matter," presenting no argument to defeat the district court's decision about the sufficiency of the evidence that rested on the evidence summarized earlier in the statement of facts, or to explain why a reasonable jury, taking all inferences to favor the government, could not conclude that at least an implicit agreement existed.

(quoting *Simmons v. City of Phila.*, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion)). Accordingly, the only issue presented by Henon with regard to the Dougherty-related honest services counts is whether proof of an explicit agreement was required.

On that point, Henon seeks to link this case to the rule of *McCormick v. United States*, 500 U.S. 257 (1991), in which the Supreme Court held that proof of an explicit quid pro quo agreement is necessary for a bribery conviction under the Hobbs Act when a public official receives a campaign contribution, in order to avoid criminalizing ordinary and essential political activity. He argues that the same rule should apply in a case such as this, where the alleged bribe consists of payments to a public official for purported lawful employment. No case, however, has ever imposed such a requirement, and Henon (and his co-defendant Dougherty as well) never suggested such a rule. And in this case, the parties were keenly aware of the *McCormick* rule, as it applied squarely to the separate charges against Henon for taking bribes from CWA and others in the form of campaign contributions (Counts 110 to 114), and the jury was appropriately instructed on the *McCormick* requirement as to those counts. App. 4056.

Apart from the context of campaign contributions, it has long been settled that, while the government must prove a public official's intent to

receive a benefit in exchange for official action, that quid pro quo

agreement may be implicit. In one of many consistent decisions, this Court

stated:

> We echo the Supreme Court's satisfaction with an implicit *quid pro quo* requirement. In *United States v. Bradley*, 173 F.3d 225 (3d Cir. 1999), we considered the question of whether, in a non-campaign contribution Hobbs Act extortion case, an express agreement must be shown. Relying on Justice Kennedy's concurrence in *Evans*, we agreed that "the official and the payor need not state the *quid pro quo* in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.'" *Bradley*, 173 F.3d at 231 (citing *Evans [v. United States]*, 504 U.S. [255,] 274 [1992]).

*United States v. Antico*, 275 F.3d 245, 257 (3d Cir. 2001). *See also*

*McDonnell v. United States*, 579 U.S. 550, 572 (2016) (the public official's

"agreement need not be explicit, and the public official need not specify the

means that he will use to perform his end of the bargain."); *United States v.*

*Kemp*, 500 F.3d 257, 284 (3d Cir. 2007); *United States v. Bryant*, 655 F.3d

232, 244-45 (3d Cir. 2001).

The appellant nevertheless asserts that the necessity of proof of an

explicit agreement in this case was presented to the district court, stating:

> This issue was raised by Mr. Henon by filing (or joining) a pre-trial motion to dismiss the honest services charges, Dkt. No. 65-1 at 15-24; Dkt. No. 84, a motion for judgment of acquittal at the close of the government's case, Dkt. No. 232-2 at 5-13, 30-32; A.3135:16-A.3145:5, and a motion for judgment of acquittal or new trial after the jury's verdict, Dkt. No. 253 at 4-11; A.3210:18-21, as well as by objecting to a mixed motive jury instruction, A.3742:1-A.3744:25.

Br. 4. But the argument was not presented in any of these places, or at any

time during the trial proceedings. To the contrary, in one of the documents

cited – the motion for judgment of acquittal filed by Henon after the trial,

at DDE # 253 – the defendant explicitly acknowledged at page 7:

> It is true that a quid pro quo need not be explicit or express, and may
> be established by circumstantial evidence. *Wright*, 665 F.3d at 568.
> Certainly, the Government may prove the quid pro quo
> circumstantially by showing that an elected official started receiving a
> salary or other benefits **he or she was not entitled** to after being
> elected to office, and thereafter engages in official acts on behalf of
> the provider. *See United States v. Bryant*, 556 F. Supp 2d. 378 (D.
> N.J. 2008).

(Emphasis in original; citing *United States v. Wright*, 665 F.3d 560, 568

(3d Cir. 2012).) Henon thus waived his current argument.

Every other citation provided by the appellant refers to a place at

which the defense made entirely different arguments.[11]

1. The appellant first cites docket entry 65, at pages 15-24, which was

Dougherty's pretrial motion to dismiss Counts 97 to 109 of the indictment

---

[11] The appellant's decision on appeal not to challenge sufficiency of
the evidence based on the implicit-agreement requirement is
understandable. As set forth in the statement of facts, there was ample
evidence on which a reasonable jury could rely to conclude that Henon did
not perform much if any work in return for the considerable benefits he
received from Local 98, other than his performance of official actions to
help his benefactor, such that, at minimum, an implicit agreement existed.
Less understandable is counsel's regrettable decision, addressed above, to
incorrectly suggest to this Court that the defense made an argument to the
district court that was not in fact presented.

(and Henon also cites his own one-paragraph filing at docket entry 84, adopting the Dougherty motion). This motion never refers to *McCormick* or the requirement of proof of an explicit agreement. Instead, the motion initiated what became the persistent assertion of the defense, that Henon had begun receiving a salary from Local 98 years before the alleged official acts occurred in 2015 and 2016, and therefore the government could not prove, even implicitly, that the salary was a "quid" given in exchange for the later acts. (The remainder of the cited section of Dougherty's motion sought to strike six alleged official acts from the indictment, arguing that they failed to describe "official acts" as defined by *McDonnell v. United States*, 579 U.S. 550 (2016).) The district court denied Dougherty's motion in a 36-page memorandum opinion, DDE # 158 (Sept. 1, 2020), which dispatched the defense arguments and of course never addressed a *McCormick* claim that was not made.

2. Henon next claims that the argument was made in Dougherty's motion for judgment of acquittal at the close of the government's case, DDE # 232-2 at pp. 5-13, 30-32. That again is untrue. At pages 5 to 13, Dougherty repeated the argument that there was insufficient proof that Henon's salary, approved years earlier, was given in exchange for later official acts, and also added the assertion that there was no proof that

Dougherty was personally involved in the payments. At pages 30 to 32, Dougherty argued that at most the evidence showed that Henon had a conflict of interest, not that he accepted payments with the knowledge that they were given in exchange for official action.

In Dougherty's motion, the only reference to *McCormick* appears in a passage Henon does not cite. In a footnote, at page 23 n.5, Dougherty argued that his specific requests for action regarding purported L&I violations rested on his right to petition government and therefore should require proof of an explicit quid pro quo (the L&I matters were the subject of two of the eight honest services counts of conviction). This again is not the argument presented now, that proof of an explicit agreement is always required whenever the payments are made in the form of salary to an elected official for separate work.

Henon also now cites the oral argument on the Rule 29 motion for judgment of acquittal, at App. 3135-45. Here again, the current argument on appeal was not remotely presented. Rather, the argument of Henon's attorney was exclusively focused on the argument that Henon had lawfully been receiving a salary for years, and thus it could not be converted into the quid for actions that arose later. Here again, counsel expressly conceded the point that the appellant nevertheless claims was preserved:

> One of the things that the court brought up in referring to this analysis under the case law, can't the government prove a corrupt agreement by circumstantial evidence? You are darn right they can, and they do it all the time. How do they do it? They do it by the obvious, circumstantial evidence that the individual was not already entitled to the benefit. It's *Bryant*.

App. 3137 (referring to *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011). Counsel was right. In *Bryant*, the Third Circuit indeed held that the following jury instruction was proper: "You may find that any salary and other financial benefits accepted by Wayne Bryant was a bribe even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for Wayne Bryant's official action." *Id.* at 245-46. *Bryant* further approved a jury instruction that the unlawful agreement may be implicit, and may rest on a "stream of benefits." *Id.* at 241.

And Henon's counsel expressly discussed the *McCormick* requirement where it actually applied, when discussing the sufficiency of the evidence on the CWA counts that involved campaign contributions. App. 3145 ("This court is well aware of the precedent that was established by our Supreme Court back in McCormick versus the United States. It's that heightened examination that must be done when we are talking about contribution payments in the context of whether an official is performing official acts, et cetera."). The court denied the Rule 29 motion, App. 28-36,

of course without discussing a challenge to the non-campaign contribution counts that was never made.

3. Henon next cites his motion for judgment of acquittal or new trial after the jury's verdict, DDE # 253 at pp. 4-11. It was in this document, as noted above, that Henon expressly acknowledged at page 7, "It is true that a quid pro quo need not be explicit or express, and may be established by circumstantial evidence." The remainder of the argument he cites repeated the persistent argument that he received a salary while a public official starting in 2012 and there was no evidence that he was paid in 2015 and 2016 in exchange for official acts. Again, Henon discussed the heightened *McCormick* standard, appropriately, only in the context of the separate CWA counts. *Id.* at pp. 18-19.

Henon's brief also cites the four-line passage at App. 3210 where defense counsel simply renewed the Rule 29 motion after the defense rested, without any elaboration.

4. Finally, Henon's brief on appeal asserts that he purportedly argued for an explicit-agreement requirement as to the Dougherty-related counts when objecting to the court's "mixed motive" instruction, at App. 3742-44. Again, this involved an entirely different subject. The district court, over a defense objection, instructed the jury that the recipient of a bribe may have

a "mixed motive," in that he "can have the intent to be influenced by a payment or a valuable thing received, even if ultimately the official ends up taking the same action that he likely would have taken if he did receive such payments." App. 4046. That instruction was consistent with this Court's precedent, *Bryant*, 655 F.3d at 242, and Henon does not challenge it further at this time.

As for whether a quid pro quo agreement has to be explicit or may be implicit, the court instructed the jury in lockstep with this Court's precedent: "the government must prove beyond a reasonable doubt that the defendants had the specific intent to enter into a quid pro quo or a stream of benefits agreement," App. 4045, but the agreement generally need not be express, App. 4044-45, except with respect to the counts resting on campaign contributions, App. 4056 (the court stated, "because the alleged bribes in those counts take the form of campaign contributions, or in another way political donations, campaign contributions under the law involve a different definition of quid pro quo for those particular counts. To find a defendant guilty on these counts involving campaign contributions, it is required that there is an explicit agreement.").

Henon never objected to these instructions, or requested any different instructions on these points. He waived his current objection, as

explained earlier. And even if his consent is merely deemed forfeiture of the basis of his appeal, he cannot prevail on plain error review.

The decision in *United States v. Jabateh*, 974 F.3d 281 (3d Cir. 2020), is informative and controlling. There, the defendant was convicted of immigration fraud offenses, in violation of 18 U.S.C. § 1546(a), based on false statements he made during an oral interview with an immigration officer. These convictions raised the maximum permissible sentence in the case from 10 years to 30 years, and the district court imposed a 30-year sentence in light of the defendant's horrific history. On appeal, the defendant argued for the first time that this statute did not reach oral statements, but rather applies only to material, false statements made in a written document under oath or under penalty of perjury. This Court, viewing the issue as one of first impression, agreed with that interpretation – but then declined to reverse the convictions or the 30-year sentence, given that the matter was presented on plain error review.

The Court stated that the error was not "plain," because "the meaning of § 1546(a) was unsettled both at Jabateh's trial and throughout this appeal," and indeed, "there is no instance of any other court considering the ordinary meaning of § 1546(a)." *Id.* at 299. In that circumstance, this Court held, the dictates of Federal Rule of Criminal Procedure 52(b), as

interpreted by the Supreme Court, mandated that this Court "cannot disturb Jabateh's conviction." *Id.* at 299-300.

The situation here is the same. Actually, it is not identical – while in *Jabateh* the Court actually agreed with the defendant's legal interpretation, here no such step is warranted.[12] But even if it were, we are addressing an argument here that was never raised in the district court at or after trial,

---

[12] We note that Henon's new argument in favor of a requirement of an explicit agreement is quite underwhelming, and incorrect. He posits that such proof is necessary to avoid penalizing public officials whose actions happen to align with the interests of their private employers. But the campaign context is different. An elected official has to gather contributions to seek office, which will ordinarily come from people and entities who favor the positions she will take. Proof of an explicit corrupt agreement was deemed necessary in *McCormick* to preserve this basic process of democracy. But an official does not have to accept outside employment that overlaps with his public duties. And more importantly, where the official's actions then align with an employer's interests, the law does not permit a conviction based on that mere alignment alone. Rather, the jury must conclude beyond a reasonable doubt that the official's action was not motivated solely by his unbiased assessment, but at least in part by an implicit agreement to take the action in exchange for personal benefits he would not otherwise have received.

Here – and Henon makes no effort to dispute this – a reasonable jury would have no difficulty in finding that additional proof of a corrupt arrangement, given the abundant evidence that Henon's role on City Council was simply to do the bidding of John Dougherty and Local 98. That proof could have started and ended with the fact, proven throughout the trial, that Henon did not do much if any independent work for Local 98 in exchange for the substantial salary and other benefits he received. The jury readily could and did conclude that the reason he was paid these sums was to take official actions. (Indeed, a jury could infer an explicit agreement from the evidence in this case, though that was not required.)

and which at present is unsupported by the ruling of any other court, let alone this Court or the Supreme Court.[13] In fact, in contrast to the situation in *Jabateh*, where the statutory issue was one of first impression, here it is an issue that this Court has repeatedly addressed and resolved contrary to Henon's new position. Notably, this Court's many endorsements of the sufficiency of proof of an implicit agreement in the non-campaign context,

---

[13] Henon contends that *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), supports his new position. That is wrong. The Second Circuit explicitly limited the decision to the facts of the case, and did not state any new standard regarding corrupt payments in the form of employment benefits. *Silver*, 948 F.3d at 553 n. 7. The *Silver* decision focused mainly on whether particular official acts were sufficient to support a bribery charge under *McDonnell*. The court held that one of the official acts alleged by the government in that case ("the Mesothelioma Scheme") was not sufficiently focused to support liability, while the evidence was sufficient as to other acts. The concurring opinion of Judge Lohier carefully explained the "narrow scope" of the opinion, making clear that the "stream of benefits" theory charged in this case remains as viable in the Second Circuit as it does here. *Id.* at 577-79. He specifically addressed the type of honest services fraud charged in this case as follows:

> Consider another example not captured by the "as opportunities arise" theory: a payment in exchange for a promise to take all future official actions to benefit the payor. The payment is not in exchange for a vague promise to act in the payor's general interests at discrete moments to be determined only at the official's discretion (as alleged in the Mesothelioma Scheme). Instead, it solicits a promise that the official will filter **every** official act through the lens of the payor's interests.

*Id.* at 578-79 (emphasis in original).

including agreements to provide a "stream of benefits," includes the decision in *United States v. Bryant*, 655 F.3d 232, 241 (3d Cir. 2011), which, identically to this case, involved payments to a public official in the form of salary and other benefits for private employment. *See also United States v. Repak*, 852 F.3d 230, 251 (3d Cir. 2017) (reaffirming the validity of the "stream of benefits" theory).

For these reasons, Henon's new objection to the sufficiency of the evidence and the jury instructions regarding the Dougherty-based honest services counts fails.

## II. THE DISTRICT COURT CORRECTLY DENIED THE DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL, OR, IN THE ALTERNATIVE, A NEW TRIAL ON COUNTS 110 AND 114

### Standard of Review

The Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). The reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430, quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). "The district court – and we – are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *Caraballo-Rodriguez*, 726 F.3d at 431, quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012). *See also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) ("A reviewing court may set aside the

jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.").

Accordingly, "[a] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (per curiam), quoting *Jackson v. Virginia*, 443 U.S. at 326 (1979). Therefore, "[w]hile evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict – and not to usurp the role of the jury – as long as it passes the 'bare rationality' test. Reversing the jury's conclusion simply because another inference is possible – or even equally plausible – is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges . . . . It is up to the jury – not the district court judge or our Court – to examine the evidence and draw inferences. Unless the jury's conclusion is irrational, it must be upheld." *Caraballo-Rodriguez*, 726 F.3d at 432.

## Discussion

Henon also briefly claims that the district court erred in not entering judgment of acquittal on Counts 110 and 114, which charged honest services wire fraud and federal program bribery based on his solicitation and acceptance of a $5,000 campaign contribution from the Communications Workers of American (CWA) Local 13000 in October 2015. Br. 61-63. He is wrong.

The district court rejected this claim when denying Henon's first motion for acquittal, stating:

> The Court finds that the Government has provided enough evidence so that a reasonable juror could find that Councilmember Henon committed official acts for campaign contributions. As for the CWA contribution, the communications requesting and accepting the CWA contributions were in the midst of Councilmember Henon and the CWA discussing the Verizon issue and what Henon could do to help.

App. 36. The district court incorporated this finding in its denial of Henon's post-trial motion for judgment of acquittal. App. 22. That judgment was and remains correct.

The evidence showed the following sequence of events:

In the fall of 2015, Verizon was completing its buildout of a fiber-optic (FIOS) network under the franchise agreement it had with the City of Philadelphia and was regularly meeting with the City of Philadelphia, specifically with the Office of Information and Technology (OIT), to

monitor Verizon's progress. At the same time, Verizon was in labor negotiations with the CWA, a union that represented many of its employees. On September 10, 2015, Jim Gardler, the head of CWA Local 13000, called Henon, complained about Verizon and the contract negotiations, and suggested that Henon could call for an audit or take some action concerning Verizon to assist the CWA with the negotiation. Henon said he would look into it. App. 4282-86.

On September 23, 2015, Henon called Gardler and asked for a campaign contribution of $10,000, or at least $5,000. Gardler said he would talk to Ed Mooney, the head of the international. App. 4287-88. Henon called Gardler back 30 seconds later and told Gardler that he ran into Doug Smith, a Verizon executive, at a coffee shop and told Smith to work out the contract with CWA.[14] App. 4289-91. Henon then asked Gardler, "So, is there . . . anything, should I just listen, or is there anything

---

[14] The jury could infer that Henon's action in making two phone calls on September 23, 2015, thirty seconds apart – one to ask for money and the second to explain what Henon was doing for CWA at its request – shows that Henon knew what he was doing was wrong. Essentially putting someone on hold for 30 seconds does not and cannot erase the fact that Henon was asking for campaign contributions at the same time he asked Gardler if there was anything he could do for him as a member of City Council. If they had met in person, and Henon walked around the block between asking for money and offering to act on behalf of Gardler in his official capacity, the result would be the same.

I . . . should be saying [to Smith]?" App. 4289. Gardler told Henon that

what the CWA really needed was a public embarrassment of Verizon

concerning the buildout. Henon replied that he would check into the status

of the buildout. App. 4291.

Henon's monetary request to Gardler was followed up in writing.

Henon also made a follow-up call to Gardler, leaving a voicemail asking

again for a contribution. Supp. App. 49.

On October 16, 2015, Gardler told Henon that he received his written

request, which was "going through" CWA's committee. Henon replied,

"Thank you. . . .Jim . . . for the record, . . . the five is the most you, you've

ever given me." App. 4292-96. *See also* Supp. App. 183 (showing spike in

donations to Henon by CWA in October 2015).

Gardler explained that he convinced others in the CWA Local 13000

to approve the contribution by assuring them, "I know what I can ask

Bobby to do for us," about as clear an expression of a quid pro quo as is

imaginable. Gardler then asked Henon to hold a hearing "to put pressure

on" Verizon. After Henon said he would see where Verizon was on the

buildout, Gardler replied he did not care where they were on the buildout,

he just wanted the hearing to put pressure on Verizon in connection with

the labor negotiations. Henon agreed, saying, "Alright, you got it." App. 4294-96.

A few days later, Henon received the $5,000 check from the CWA, and emailed two of his City Council staffers, Courtney Voss and Chris Creelman, and asked them to remind him to schedule a hearing on the Verizon buildout.

During a call on November 10, 2015, after Henon suggested that no one in the administration wanted a hearing, Gardler reminded him that "the whole point of doing this on our end is to put some pressure on them with the problems we're having at the bargaining table." Henon agreed to get a December hearing set and use that as leverage. Supp. App. 51.

On November 18, 2015, Henon told Gardler that he had a meeting with Doug Smith of Verizon at which he told Smith that a hearing had been set, and, according to Henon, "the color in his face changed." Gardler replied, "Good, good. That's exactly what we wanted to get out of him." Supp. App. 55.

In April of 2016, the labor negotiations broke down, and CWA went on strike. Henon ordered his staff to schedule a hearing on Verizon's buildout as soon as possible. Supp. App. 108-10, 123.

The hearing was finally scheduled for April 29, 2016, allegedly to address the status of Verizon's installation of fiber optic cable in Philadelphia, even though the Philadelphia Office of Information and Technology, which was overseeing the project, had not requested a hearing and did not feel that a hearing was necessary. App. 1373-74.

On April 27, 2016, Henon called Gardler and told him to fill as much of the Council chamber with CWA members as possible. Supp. App. 74. The hearing lasted three hours; approximately two hours of a recording of it was played for the jury. App. 1553-54; Supp. App. 184 (screen shot of Gov't Exh. 302). At various points during the hearing, to applause, Henon accused Verizon of lying and failing to verify the status of the buildout, even after he was informed that the verification had been delayed by the CWA strike. CWA's Ed Mooney even sent Dougherty a text during the hearing thanking Dougherty because Henon was "killing" Verizon. Supp. App. 31. Henon continued to hold up his end of his corrupt agreement with Gardler a few weeks later, when he made negative comments about Verizon to a radio reporter, and then bragged about it to CWA president Ed Mooney ("I f***ing destroyed them [Verizon] on KYW today," Supp. App. 78), and Jim Gardler ("I really . . . f***ed them up," Supp. App. 81-82).

The evidence, viewed in the light most favorable to the government, was sufficient to support the jury's verdict that Henon accepted a campaign contribution from the CWA in exchange for putting pressure on Verizon by forcing it to submit to a hearing that was not even necessary.

With respect to these counts, in contrast to the Dougherty-related counts discussed earlier, the government was in fact required under *McCormick* to prove an explicit quid pro quo agreement. Evidence of such an agreement most clearly appeared in a conversation on October 16, 2015, when Gardler made explicitly clear to Henon that the contribution was made in exchange for Henon's support on City Council. During the call, Gardler explained to Henon how Gardler was able to get the union board to approve the $5,000 payment. Gardler said, "I got a guy that's on our Board from Pittsburgh," and "that's why I have to explain to him, because when he comes to me asking for money for a city council guy out in Pittsburgh, I'm gonna say, alright, what's that guy gonna do for us because I know what I can ask Bobby to do for us." Henon responded, "Right." App. 4294. Gardler then immediately proceeded in the very same conversation to carry through, and ask Henon again to hold a hearing "to put pressure on" Verizon. *Id.* Henon agreed, and then performed as agreed. The

pertinent official act that was the subject of this explicit agreement was a hearing involving Verizon before City Council, clearly an official act.

In challenging the conviction, Henon asserts that his assistance to CWA was merely consistent with his support for labor. Br. 62. But that of course does nothing to justify the explicit quid pro quo arrangement heard on tape. The question is whether Henon knew that the money was paid to him at least in part to secure his support. Gardler explicitly said on the call that it was. Henon's only other objection is that "the alleged official act—a hearing regarding Verizon's problems with the build-out—did not take place until six months after the contribution was made." Br. 62-63. But the fact that the hearing was delayed multiple times, not by Henon, until April of the next year, does not matter. The terms of the quid pro quo agreement between Gardler and Henon were clearly set forth during their October 16 conversation. Everything both of them said and did after that was entirely consistent with the agreement.

Henon's attempt to induce this Court into setting aside his conviction for this conduct by substituting his assessment of the evidence for that of the jury must be rejected. The evidence, viewed in the light most favorable to the prosecution, sufficiently supported the jury's verdict beyond a reasonable doubt that Henon solicited and accepted a $5,000 campaign

donation from the Communications Workers of America in October 2015 in exchange for agreeing to hold a hearing before City Council involving Verizon's installation of fiber optic cable in Philadelphia.[15]

---

[15] In a final argument in this appeal, Henon contends that the district court erred in imposing a forfeiture money judgment in the amount of $207,948.70, claiming that the district court lacked the authority to impose an *in personam* forfeiture money judgment. He asserts that the controlling Third Circuit case of *United States v. Vampire Nation*, 451 F.3d 189 (3d Cir. 2006), was erroneously decided and should be reconsidered en banc. Br. 63-64. The panel considering this claim should summarily deny it.

## CONCLUSION

For the reasons stated above, the government respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney


*s/ Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126


*s/ Frank R. Costello, Jr.*
FRANK R. COSTELLO, JR.
Assistant United States Attorney
Pa. Bar No. 44929

United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8397

## CERTIFICATION

1. The undersigned certifies that this brief contains 12,332 words, exclusive of the table of contents, table of authorities, signature block, and certifications, and therefore complies with the limitation on length of a brief stated in Federal Rule of Appellate Procedure 32(a)(7)(B).

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

*s/ Frank R. Costello, Jr.*
FRANK R. COSTELLO, JR.
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing Users

identified below through the Electronic Case Filing (ECF) system:

> Bruce P. Merenstein, Esq.
> Robert E. Welsh, Jr., Esq.
> Richard D. Walk, III, Esq.
> Welsh & Recker
> 306 Walnut Street
> Philadelphia, PA  19106


*s/ Frank R. Costello, Jr.*
FRANK R. COSTELLO, JR.
Assistant United States Attorney


DATED: November 28, 2023.