No. 23-1463

---

**United States Court of Appeals
for the Third Circuit**

---

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT HENON,

Appellant.

---

**On Appeal from the March 2, 2023, Final Judgment in the
United States District Court for the Eastern District of Pennsylvania,
No. 2:19-cr-00064-JLS**

---

**REPLY BRIEF OF APPELLANT**

---

Bruce P. Merenstein
Robert E. Welsh, Jr.
Richard D. Walk, III
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
(215) 972-6430

*Attorneys for Appellant*

December 19, 2023

# TABLE OF CONTENTS

Table of Authorities ................................................................................. ii

Introduction .........................................................................................1

Argument .............................................................................................4

    I.   The government fails to rebut Mr. Henon's argument that, in the present context, the government should have been required to prove (and failed to prove) beyond a reasonable doubt that Mr. Henon *explicitly agreed* to take specific official acts *because of* the compensation he received for his lawful outside employment.............................................................................4

    II.  Mr. Henon preserved in the trial court the issues and arguments that he raises on appeal and, even if he had not, the trial court's decision not to enter judgment of acquittal or order a new trial would be plain error warranting relief...........................14

    III. The government points only to evidence that Mr. Henon put pressure on Verizon to help the CWA, consistent with his pro-union sentiments, and not that he explicitly agreed to put pressure on Verizon in exchange for the CWA's campaign contribution ...........................................................................21

Conclusion............................................................................................25

# TABLE OF AUTHORITIES

*Cases*

*Bagot v. Ashcroft*, 398 F.3d 252 (3d Cir. 2005) .................................................... 19

*Ingram v. Experian Info. Solutions, Inc.*, 83 F.4th 231 (3d Cir. 2023) ................ 14

*McCormick v. United States*, 500 U.S. 257 (1991) ........................................... 2, 22

*Skilling v. United States*, 561 U.S. 358 (2010) .................................................... 2

*Tunis Bros. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991) ................................. 4

*United States v. Abreu*, 32 F.4th 271 (3d Cir. 2022) ..................................... 14-15

*United States v. Benjamin*, 711 F.3d 371 (3d Cir. 2013) ..................................... 18

*United States v. Fallon*, 61 F.4th 95 (3d Cir. 2023) ............................................. 5

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018) ........................................ 4

*United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013) .......................................... 15

*United States v. Morton*, 993 F.3d 198 (3d Cir. 2021) ................................... 18-19

*United States v. Ramirez-Erregun*, 149 F. App'x 111 (3d Cir. 2005) ................... 19

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), *cert. denied*, 141 S.
     Ct. 656 (2021) ........................................................................................... 9-10

*United States v. Stinson*, 734 F.3d 180 (3d Cir. 2013) ........................................ 18

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999) .................. 8

*United States v. Tann*, 577 F.3d 533 (3d Cir. 2009) ........................................... 18

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020) ...................................... 15

*Statutes and Rules*

FED. R. CRIM. P. 52(b) ............................................................................................ 18

The government's appellate brief not only fails to rebut the central argument in Robert Henon's appeal but reinforces the critical point made in Mr. Henon's opening brief: the honest services fraud statute must be interpreted to apply a heightened standard when a public official who lawfully holds a separate private-sector position is accused of taking actions favored by his private-sector employer that he "would obviously take anyway as an elected official." Gov't Br. 14. Otherwise, every elected official who lawfully holds outside employment risks facing prosecution and conviction for serious federal crimes whenever he takes routine actions as an elected official that happen to benefit his outside employer.

Indeed, the government's brief makes clear that its case against Mr. Henon was based on its view that it was not possible to determine whether actions Mr. Henon took were "as a member of City Council or as a member of Local 98." *Id.* In other words, Mr. Henon's continued union employment after he was elected to City Council as a strongly pro-union candidate made it impossible to determine in many instances whether he was acting in his role as a union employee or as an elected (pro-union) member of City Council. This may be an argument for prohibiting elected Philadelphia city

officials from keeping their outside employment (a decision for local or state authorities, not federal prosecutors) or a concern that outside employment can create conflicts of interest by blurring the lines between private and public positions (again, a matter for local or state authorities, at least since the Supreme Court's *Skilling* decision). But it should not form the basis for a conviction on an honest services fraud charge in the absence of evidence (and a jury finding) that the public official explicitly agreed to take specific official acts because of his lawful outside employment. *Cf. McCormick v. United States*, 500 U.S. 257, 273 (1991).

In an effort to avoid this conclusion, which flows directly from numerous Supreme Court precedents, the government resorts to a waiver argument. Yet there is no question that Mr. Henon raised a sufficiency argument in the trial court grounded in the particular circumstances of this case (*i.e.*, his lawful outside employment) and no question that Mr. Henon objected to jury instructions that allowed the jury to reach a guilty verdict even if it did not conclude that he took the official acts in question specifically because of his outside employment. Mr. Henon repeatedly argued in the trial court that the circumstances surrounding his outside employment precluded a conviction on honest services fraud because that

statute did not prohibit a local official from lawfully continuing to hold an outside position, even if it arguably created conflicts with his elected position, unless the evidence showed that the outside employment was expressly given in exchange for promising to take certain official acts. That is precisely the argument Mr. Henon makes here.

As to the two CWA-related charges on which Mr. Henon was convicted, the undisputed evidence was that, long before he received the campaign contribution at issue, Mr. Henon was on record as being "100 percent pro labor," A.958:24-A.959:2, and strongly supportive of unions embroiled in protracted disputes with city contractors like Verizon. Not only was the "official act" of holding a hearing to put pressure on Verizon entirely consistent with Mr. Henon's longstanding positions, views, and advocacy, but there was no evidence that he held the hearing *only because* he received the modest campaign contribution from the CWA six months earlier. To the contrary, all the evidence indicates that, even if no such contribution were made, Mr. Henon would have held the Verizon hearing to help out the CWA.

**I.    The government fails to rebut Mr. Henon's argument that, in the present context, the government should have been required to prove (and failed to prove) beyond a reasonable doubt that Mr. Henon *explicitly agreed* to take specific official acts *because of* the compensation he received for his lawful outside employment.**

As discussed below, the government's discussion of the facts reinforces

Mr. Henon's argument that, in the present context, the honest services

fraud statute should be interpreted to require proof beyond a reasonable

doubt that a public official explicitly agreed to take specific official acts

because of the compensation he received for his outside employment.[1]

While Mr. Henon takes no issue with the great majority of the *facts* set forth

---

[1] In an effort to imply that there are many more relevant facts that support its contentions than those in its appellate brief, the government more than once invites the Court to review its trial court brief, effectively adding more than 21,000 words to its 12,000-word appellate brief. But a party cannot incorporate by reference arguments made or briefs filed in lower courts. *See, e.g.*, *United States v. Gonzalez*, 905 F.3d 165, 206 n.18 (3d Cir. 2018) (citing *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 741 (3d Cir. 1991)).

The government also refers in passing to Mr. Henon's alleged "one-sided statement of facts in [his] brief," Gov't Br. 13 n.7, but the statement of facts in Mr. Henon's opening brief was scrupulously even-handed. Indeed, it is remarkable how few facts (none of them significant) the government refers to that were not already discussed in Mr. Henon's opening brief. It is the government, in fact, that lards its statement of facts with conclusions and interpretations that properly belong, if anywhere, in its argument section.

by the government,[2] the government seeks to avoid the serious due process and federalism issues raised by Mr. Henon by asserting certain *conclusions* neither supported by the evidence nor found by the jury.

1. The government acknowledges that its case against Mr. Henon was largely based on the substantial overlap between his lawful outside employment and his elected position, noting that Mr. Henon's Local 98 job was (in Courtney Voss's words) "really about politics and about managing relationships," Gov't Br. 16 (quoting A.3646:23-24), which (in the government's words) "just happens to be closely related to his position on City Council." *Id.* Similarly, the government points to the uncertainty whether certain actions Mr. Henon took were "as a member of City Council or as a member of Local 98." Gov't Br. 14.

The government thus discloses the heart of its complaint: Mr. Henon held two closely related positions, one public and one private, at the same

---

[2] To be clear, Mr. Henon respectfully disagrees with the jury's reading of the evidence, but accepts that this Court must consider any evidence regarding "essential elements of the crime"—*i.e.*, honest services fraud, *see* Henon Br. 38-39 n.9—"in the light most favorable to the government." *United States v. Fallon*, 61 F.4th 95, 120 (3d Cir. 2023) (internal quotation omitted). Yet the government plainly reaches too far, assuming that the jury agreed with *every one* of the government's factual contentions and conclusions therefrom, even those not necessary to the jury's verdict.

time. But this is not a crime. Nor should a felony conviction turn on a jury's resolution of whether certain actions fell on the private or public side of what the government concedes was a blurry line dividing two "closely related" positions.

2. The government points to no evidence demonstrating that Mr. Henon would not have taken all of the same official acts that formed the basis for his convictions if he were not paid a single penny by Local 98. Instead, it puts much emphasis on its contention that Mr. Henon took those actions because Mr. Dougherty told him to do so. But even if this were true (and plenty of evidence puts it in doubt), these are not the same thing.

Even if an elected official takes direction from a particular individual or entity with regard to official acts, this does not constitute honest services fraud unless the official accepts a benefit in exchange for following that direction regarding the official acts. And whether Mr. Henon took the official acts at issue because they were consistent with his well-established pro-union, pro-worker positions (as the evidence strongly suggests) or because Mr. Dougherty told him to do so (as the government contends), no evidence demonstrated that Mr. Henon agreed to take those actions *because of* his Local 98 compensation.

3.  The government contends that Mr. Henon "went to lengths" to conceal his "'employment'" by Local 98, Gov't Br. 11 (internal quotations in original), but it concedes that he reported his employment on his annual public financial disclosure forms and that Local 98 reported it to the federal Department of Labor. As discussed in Mr. Henon's opening brief (at 10-12), there was substantial evidence that his employment was far from a state secret. And the District Court itself commented that "Mr. Henon collected a salary from Local 98 and disclosed his relationship and the salary every year to anyone who was noticing or was paying attention." A.4213:20-23.

It is irrelevant whether Mr. Henon or the union reported his job as electrician, office worker, or political director (*see* Gov't Br. 11-12); the government's case relied on its claim that Mr. Henon did *no work* for his salary, not that he misrepresented the title of his position or that he pretended to be moonlighting as an electrician. The only relevant facts for present purposes were that Mr. Henon was lawfully employed by the union, and he and the union disclosed that fact to anyone who required them to or inquired about it.

4.  In attempting to link Mr. Henon's Local 98 compensation to his official acts, the government contends that his salary payments were made

"at precisely the same time as each official act at issue." Gov't Br. 17. Of course they were. Mr. Henon was paid weekly. A.1771:13-14. Thus, *any* official acts—indeed, *anything at all* that Mr. Henon ever did—inevitably would occur "at precisely the same time" as his salary payments, *i.e.*, within no more than three days of any particular weekly payment.

This proves nothing regarding the necessary link between the payments and the official acts. Rather, it simply highlights how application of the stream-of-benefits theory in the context of lawful outside employment with regular salary payments nullifies the requirement that "the Government … prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 414 (1999).

5.  The government contends that Mr. Henon's purported failure to discuss with Mr. Dougherty the merits of the relevant official acts demonstrates Mr. Henon's subservience to the Local 98 leader. But as Mr. Henon detailed at length in his opening brief, his actions involving L&I, Comcast, the soda tax, and the towing resolution were all consistent with his previously stated positions, and Mr. Henon—not Mr. Dougherty—first

raised the idea of introducing the new plumbing code, as the government concedes. *See* Gov't Br. 17-18.

The government implicitly concedes that it relies entirely on *Mr. Dougherty's* braggadocious statements that he would tell Mr. Henon "what to do," Gov't Br. 18, as it does not point to a single one of the voluminous wiretapped calls in which *Mr. Henon* indicated that his actions as a councilmember were controlled by Mr. Dougherty, let alone—as the charges required—that those actions were controlled by the compensation Mr. Henon received from Local 98.

The government also claims that this was a case in which a public official promised to "filter *every* official act through the lens of the payor's interests." Gov't Br. 46 n.13 (quoting *United States v. Silver*, 948 F.3d 538, 578-79 (2d Cir. 2020) (Lohier, J., concurring) (emphasis in original), *cert. denied*, 141 S. Ct. 656 (2021)); *see also id.* at 45 n.12 (same). But the jury was not required or asked to find anything of the sort. Rather, it only had to find that Mr. Henon accepted "something of value in exchange for … favorable treatment." A.4034:13-15; *see also* A.4044:4-7 (instruction that jury must find that defendants intended that "John Dougherty would give something of value to Robert Henon in which he was not entitled in return

for one or more official acts of Robert Henon."). Thus, the government's attempt both to distinguish *Silver* and to transform its unsupported theory into a definitive conclusion are unavailing.

6. Finally, the government puts much weight on its contention that Mr. Henon "did not perform any significant work of any kind for Local 98." Gov't Br. 6. But this too is a conclusory statement and not a fact necessarily found by the jury.

Moreover, the government's own factual recitation and legal argument reveal the flaw in this contention. On the one hand, the government contends that Mr. Henon did essentially *no* work for Local 98. On the other hand, it contends that the only thing he did as a councilmember was advance the interests of Local 98 (and its leader, Mr. Dougherty) through various official acts. *See, e.g.*, Gov't Br. 45 n.12 ("Henon's role on City Council was simply to do the bidding of John Dougherty and Local 98.").[3] Thus, somehow, the very same conduct simultaneously constitutes *both* actions for Local 98 and official government acts, as well as proof that Mr.

---

[3] The District Court did not share the government's dim view of Mr. Henon's service as a councilmember. *See, e.g.*, A.4213:4-11 (noting that Mr. Henon "has been a good public servant").

Henon was not properly fulfilling *either* his private-sector job or his public position. Consider just a few examples.

Mr. Henon, Local 98's former political director and current part-time employee, is asked by Mr. Dougherty or other Local 98 staffers to contact a City agency head about the use of non-union labor at a City-regulated hospital or to arrange a meeting with the agency head regarding the use of non-union labor at other worksites. Mr. Henon, Local 98's former political director and current part-time employee, is asked by Mr. Dougherty to take a number of local politicians to a sports event. Mr. Henon, Local 98's former political director and current part-time employee, is asked by Mr. Dougherty to arrange a meeting with representatives of a City contractor to discuss the contractor's use of non-union labor.

Each of these actions by Mr. Henon easily fits within his Local 98 union responsibilities. If Mr. Henon did each of them when he was *only* a union political director and *not* an elected official, nobody would think twice about the appropriateness of his actions.[4] Yet contacting a City agency

---

[4] The government makes much of the purported absence of Mr. Henon's "work product" from his Local 98 position, *e.g.*, Gov't Br. 9-11, as if he were an appellate attorney with briefs and time records to document his work product. As discussed in the text, the trial record was replete with evidence

head, socializing with City Council members, and negotiating with a City contractor fell within Mr. Henon's remit as a councilmember as well. Again, if he were *only* a councilmember and not a (lawfully) paid Local 98 employee, his actions would be unremarkable. The government concedes as much, referring to much of Mr. Henon's actions at issue as those that he "would obviously take anyway as an elected official." Gov't Br. 14.

Do these circumstances create blurred lines? Certainly. Do they present potential conflicts of interest? Possibly. But the government can convert them into federal crimes only by its convoluted and oxymoronic reasoning: Despite being consistent with Mr. Henon's Local 98 duties, none of these actions, the government argues, constituted "significant work of any kind for Local 98." Gov't Br. 6. Yet all of them are proof that Mr. Henon was doing Local 98's (or its leader's) bidding.

It's heads we win, tails you lose, when it comes to the government's interpretation of the evidence. The same evidence is proof of everything and proof of nothing (or, rather, that Mr. Henon did nothing). And this is

---

of Mr. Henon's work product as a part-time Local 98 employee, but rather than acknowledge such work product, the government both disparages and ignores the work that Mr. Henon did for Local 98.

precisely the problem with not applying a higher standard to honest services charges in the context of lawful outside employment. As Mr. Henon explained in his opening brief, a conviction for honest services fraud should not turn on a federal prosecutor's (or even a jury's) view of whether a public official did *just enough* work for his outside employer to justify his private-sector compensation. Nor should an elected official be required — in order to avoid conviction for honest services fraud — to terminate lawful outside employment because it entails job responsibilities that too closely track those of the official's elected position.

Here, there is no dispute that Mr. Henon held his Local 98 position for many years *before* he was elected to office, negating any possibility that he was given his job, and his salary, specifically in exchange for any official acts. There is no dispute that local and state law permitted Mr. Henon to *continue holding* his private-sector position after his election. There is no dispute that the union cut his pay *roughly in half* upon his election in recognition of his reduced responsibilities. And there is no dispute (though the government seeks to dismiss it in a footnote as "vague testimony") that Mr. Henon did work for Local 98, *see* Henon Br. 11-12, even aside from the

work discussed above that the government discounts by placing it entirely within Mr. Henon's City Council scope of responsibility.

Despite these undisputed facts, the government contends that the jury could *infer* that Mr. Henon agreed to take official acts in exchange for his allegedly unearned salary. Allowing a conviction to stand on such flimsy evidence of a corrupt exchange, where the purported benefit was compensation for lawful outside employment, effectively overrides the decisions of local and state authorities to permit such employment. And it reimposes a federal regime that criminalizes conflicts of interest, rather than actual bribes.

## II. Mr. Henon preserved in the trial court the issues and arguments that he raises on appeal and, even if he had not, the trial court's decision not to enter judgment of acquittal or order a new trial would be plain error warranting relief.

1. Mr. Henon preserved in the trial court the issues and arguments that he raises on appeal. This Court recently reiterated that, to preserve an issue for appeal, "a party need only preserve issues, not cite or distinguish specific authorities." *Ingram v. Experian Info. Solutions, Inc.*, 83 F.4th 231, 240 n.5 (3d Cir. 2023). "[P]reservation requires advancement of the same legal principle, not citation to the same legal precedent." *United States v. Abreu*,

32 F.4th 271, 275 (3d Cir. 2022). This Court also has held that, even in the more stringent evidence-suppression context, arguments may be reframed on appeal. *See United States v. Joseph*, 730 F.3d 336, 341 (3d Cir. 2013) ("Parties are free … to place greater emphasis and more fully explain an argument on appeal than they did in the District Court. They may even, within the bounds of reason, reframe their argument.").[5]

In the trial court, Mr. Henon argued that, under controlling precedent interpreting the honest services fraud statute (and its bribery component), the Local 98-related allegations of the indictment, and later, the evidence presented at trial, were insufficient to support Mr. Henon's conviction. Among other things, Mr. Henon focused on the *pro*, or exchange, element of the *quid pro quo* requirement, arguing that this element could not be established under the facts of this case, in which the *quid* (Mr. Henon's Local 98 salary) pre-dated any possible *quo*, or official act, because Mr. Henon legitimately and lawfully held his Local 98 position for years before he became a councilmember. Mr. Henon's argument on appeal relies on the

---

[5] In *United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020), the Court "decline[d] to import *Joseph* wholesale" into the broader preservation context.

same controlling precedents, the same key element of the relevant charges, the same central facts (primarily, his lawful outside employment and concomitant compensation). At most, he has reframed his argument—something this Court has approved, even in contexts in which the preservation hurdle is higher than it is here—focusing less on the pre-existing nature of his lawful outside employment (still a relevant fact, however) and more on the effect that his lawful outside employment has on the *quid pro quo* analysis required for an honest services fraud conviction.

The argument, however, is basically the same one made in the trial court. Indeed, if it were not, the District Court would not have indicated in its primary opinion that it felt "compelled to acknowledge the potential issues with the current state of honest services fraud law," after "noting the defendants' repeated objections to this case since its inception, after seeing the evidence in the Government's case-in-chief, and after reviewing numerous cases involving honest services fraud from the Supreme Court, Third Circuit, and other courts," A.31 n.3—the very same cases that form the basis for Mr. Henon's arguments on appeal. The trial court went on to acknowledge that, in the present circumstances, "there are certain legal

issues," and Mr. Henon's lawful outside employment—the issue at the heart of Mr. Henon's arguments in both the trial court and on appeal— "complicates this case." *Id.*

The court returned to this same issue at Mr. Henon's sentencing hearing, noting that, "although this case is labeled a public bribery case, in fact it's very unique and does not fit into a box. It's not akin to the other cases that are labeled this way." A.4213:17-20. The court again emphasized that Mr. Henon's case "was extremely complicated by the fact that under the Philadelphia City Charter council people are generally permitted to have employment in addition to their governmental duties." A.4213:13-16.

The trial court plainly recognized and struggled with the interpretation and application of the honest services and bribery statutes in the specific circumstances of this case, in light of controlling precedent that had narrowed the scope of those statutes to address due process and federalism concerns—the very same focus of Mr. Henon's appeal regarding the Local 98-related counts. The issue before this Court is the proper interpretation of these statutes in the circumstances of this case, in light of the substantial due process and federalism concerns that the Supreme Court has invoked in interpreting these same (and similar) statutes. Mr. Henon's statutory

interpretation argument was preserved in the trial court and is reviewed by this Court *de novo*. The Court should reject the government's waiver argument.

2.  Even if Mr. Henon had not preserved the issue he raises on appeal, the trial court's failure to enter judgment of acquittal or order a new trial on the Local 98-related charges constitutes plain error. "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b).

An error is plain when it is "clear" under current law. *United States v. Morton*, 993 F.3d 198, 205 (3d Cir. 2021). Even "an issue of first impression" can constitute plain error, because "lack of precedent alone will not prevent [the Court] from finding plain error." *United States v. Stinson*, 734 F.3d 180, 184 (3d Cir. 2013). For example, the Court can find plain error when no precedent directly resolves the issue but prior cases point ineluctably in one direction. *See, e.g.*, *United States v. Tann*, 577 F.3d 533, 536-37 (3d Cir. 2009) (finding plain error where the Court had "not yet addressed" the issue, but it did "not write on a blank slate"); *see also United States v. Benjamin*, 711 F.3d 371, 379 (3d Cir. 2013) (same).

If an error is plain, this Court may grant relief if that error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Morton*, 993 F.3d at 203 (internal quotation and brackets omitted). This Court also may address "a pure question of law even if not raised below where refusal to reach the issue would result in a miscarriage of justice or where the issue's resolution is of public importance." *United States v. Ramirez-Erregun*, 149 F. App'x 111, 113 (3d Cir. 2005) (quoting *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005)).

As discussed at length in Mr. Henon's opening brief (at 39-61), numerous Supreme Court precedents compel the conclusion that, in the present circumstances, an honest services fraud conviction based on a bribery theory requires proof beyond a reasonable doubt that an elected official explicitly agreed to take a particular official act specifically because of his compensation for lawful outside employment. At Mr. Henon's trial, the government did not meet this burden and the jury was not required to find that the government had done so in order to return a guilty verdict on the Local 98-related charges. As such, the District Court's error in not entering judgment of acquittal or ordering a new trial was plain.

That error seriously affected the fairness, integrity, and public reputation of the judicial proceedings because it contravened the due process protections the Supreme Court has established for criminal defendants facing honest services and bribery charges, as well as the limits on such charges the Court has imposed to protect the Constitution's federalism component.

If Mr. Henon's convictions are allowed to stand, every public official "who retains a salary from an outside employer, communicates with that outside employer, and then acts or agrees to act in relation to that communication [is] then susceptible to a honest services fraud prosecution." A.31 n.3. This is disturbing in and of itself—and seriously calls into question the fairness, integrity, and public reputation of federal criminal proceedings involving public officials. But the more substantial miscarriage of justice arises from the fact that not only prosecution, but conviction, could follow from such lawful and routine conduct, solely because a jury inferred that the otherwise proper official acts were motivated in some small part by the lawful outside employment.

Relief is warranted here, even if Mr. Henon had not raised in the trial court the argument he now makes on appeal, in order to preserve fairness,

integrity, and the reputation of judicial proceedings in the very public context of prosecution of public officials for honest services fraud.

**III.    The government points only to evidence that Mr. Henon put pressure on Verizon to help the CWA, consistent with his pro-union sentiments, and not that he explicitly agreed to put pressure on Verizon in exchange for the CWA's campaign contribution.**

The government concedes that Mr. Henon agreed to assist the CWA with its tough Verizon negotiations *before* the CWA made the campaign contribution at issue and weeks before Mr. Henon even sought a campaign contribution from the CWA. *See* Gov't Br. 51. The government then ignores this conceded fact in arguing that there was a sufficient relationship between the eventual request for the campaign contribution and Mr. Henon's reiteration of his earlier offer to assist the CWA with its Verizon negotiations for the jury to conclude that Mr. Henon made "an explicit promise" to assist the CWA in return for the campaign contribution. Gov't Br. 51 n.14.

Presumably, in the government's view, the only way that the strongly pro-union councilmember could have avoided the possibility of a bribery conviction for accepting a contribution from a union was to explicitly

promise *not* to do anything to assist the union if it contributed to his campaign. The law requires nothing of the sort.

What the government describes as "as clear an expression of a *quid pro quo* as is imaginable" (Gov't Br. 52) is the precise calculus that every entity making a campaign contribution undertakes: what can this official "do for us" (A.4294) if he is elected or reelected to office? If taking into account what an official can "do for us" is a federal offense, no campaign contributor or recipient is safe from a possible bribery conviction.

Of course, this is why the Supreme Court in *McCormick* required proof beyond a reasonable doubt that campaign contributions were "made in return for an explicit promise or undertaking by the official to perform or not to perform an official act," *i.e.*, proof that the official agreed that "his official conduct will be controlled by the terms of the promise or undertaking." 500 U.S. at 273. But that heightened standard is rendered meaningless if a staunchly pro-union official, who has openly expressed not only his support for unions but specifically his support for unions and workers embroiled in disputes with city contractors, can be convicted of bribery simply for holding a hearing at a union's request to put pressure on one of those city contractors in its dispute with that union.

There can be no doubt that if all the facts were the precise same—even the exact same words were used in Mr. Henon's discussions with the CWA official—but the CWA chose *not* to make a contribution to Mr. Henon in October 2015, Mr. Henon still would have held the hearing in April 2016. This is so because he was "100 percent pro labor," A.958:24-A.959:2, and "the foundations of labor" were "the foundations of [his] work" as a councilmember as well. A.4337.

When asked in early 2015 why he sought the local labor federation's endorsement, Mr. Henon explained that he had "represented and worked for labor interests for more than two decades, well before taking public office." *Id.* In describing his work in his first term as a councilmember, he noted that he had "strived to proactively support the entire labor community through legislative efforts and public support of the labor community's programs, events and initiatives." *Id.* He extolled the "right to collective bargaining" as "a fundamental right," referred to his support as a councilmember for local unions in their "protracted fights" with employers, and specifically pointed to his support for higher wages and

organizing rights for city contractors and subcontractors. A.4338-A.4340.[6]

This full-throated support for organized labor is not a federal crime. Nor

was holding a hearing to pressure a major City contractor, Verizon, to

bargain fairly with its union.[7]

If accepting a contribution from a sector of society—here, the labor

movement—from which an elected official draws the bulk of his support,

specifically because he openly and strongly supports that sector, and then

taking routine action that is entirely consistent with the official's

longstanding positions can form the basis for a bribery conviction, the fate

of all elected officials who accept campaign contributions from likeminded

---

[6] There is no dispute that Mr. Henon's connection with, and support for, organized labor long pre-dated the CWA's October 2015 contribution. Notably, his expression of that connection and support in the labor federation questionnaire came more than seven months before the CWA contribution and more than a year before the "official act" of the Verizon hearing.

[7] The government ends its factual discussion of the Verizon issue with brief references to Mr. Henon's calls with the CWA's Ed Mooney and Jim Gardler about two weeks after the Verizon hearing. *See* Gov't Br. 54. But what those calls unequivocally show is that Mr. Henon was proud of his work (at the Verizon hearing and otherwise) on behalf of the CWA and its union members, not that he held the hearing in exchange for a campaign contribution. *See* Supp. App. 78-84. Again, such activity (and pride about it) is not a federal crime.

contributors — that is to say, virtually all elected officials — is at the mercy of federal prosecutors.

CONCLUSION

The Court should reverse Mr. Henon's convictions and remand for entry of judgment of acquittal on all counts. In the alternative, the Court should reverse the convictions and remand for a new trial on Counts 97, 100-103, 105-106, and 108.

Respectfully submitted,

/s/ Bruce P. Merenstein
Bruce P. Merenstein, PA Bar No. 82609
Robert E. Welsh, Jr., PA Bar No. 28143
Richard D. Walk, III, PA Bar No. 329420
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
(215) 972-6430

*Counsel for Appellant Robert Henon*

Dated: December 19, 2023

## CERTIFICATE OF COMPLIANCE

*Word Count.* I certify that this Reply Brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) in that it contains 5,310 words, not including the portions excluded by Rule 32(f), as counted by Microsoft Word word-processing software.

*Virus Check and Electronic Version.* I certify that the text of this electronic Reply Brief is identical to the text of the paper copies of the Reply Brief filed with the Court, and that a virus detection program, Trend Micro Security Agent version 6.7.3578/14.3.1105, has been run on the electronic Reply Brief and that no virus was detected.

*Service.* I certify that, on December 19, 2023, this Reply Brief was filed through the Court's electronic docketing system pursuant to Local Rules 31.1(b)(1) and 113.1(a), and was served on all counsel of record by the Court's Notice of Docket Activity pursuant to Local Rules 31.1(d) and 113.4(a).

/s/ Bruce P. Merenstein
Bruce P. Merenstein
*Counsel for Appellant Robert Henon*